ELIZABETH A. DILLARD *et al.*, plaintiffs in error, *vs.* SIMEON C. ELLINGTON, administrator, defendant in error.

1. Where a bill for account alleges that a full accounting involves the investigation and settlement of several connected matters, and prays for discovery as to all of them ; and where the complainants, after obtaining the discovery, amend the bill, striking therefrom one of the matters, (as·to which the discovery made is favorable to the defendant,) the defendant is still entitled to use his answer as evidence, so far as it is responsive to the origginal bill. And the matter stricken from the bill is not put out of the case as to any purpose of defense which it would have subserved had it not been stricken.

2. When the complainants have gone behind a discharge granted to an executor by the ordinary, and have obtained discovery from him as to the actual state of his accounts, the executor may insist on having the actual state thereof considered in measuring the relief to which the complainants are entitled in respect to another branch of the case, so far as the accounts are correct and pertinent to the relief prayed for. If the judgment of discharge would have barred either party, each has waived the bar as to this litigation.

3. While it is possible for a responsive answer to discredit itself by contradictions and inconsistencies, or by gross violations of probability, and while, without such infirmities, it may be overcome by documentary evidence, still, when the court has charged the general rule that two witnesses, or one witness and corroborating circumstances, are required to overcome it, any further charge, if omitted, ought to be requested by counsel.

4. When, on the trial of exceptions of fact to the master's report, the report has been read to the jury by the excepting party, it is before them, not only as pleading, but as evidence.

5. In directing the jury on the form of their verdict, it is not error for the court to say, that the jury should find for or against each exception and declare it sustained or not sustained.

6. Where the evidence is, that bonds received by a legatee from the executor, were received *as bonds*, the jury should not be instructed to determine whether they were accepted as " good money."

7. The turning over, by an executor, to a legatee, of bonds in which the money of the estate has been legally invested, is in the nature, not of paying a debt, but of surrendering a trust fund. The transaction is not between debtor and creditor, but between trustee and *cestui que trust*.

8. When a legatee receives from the executor bonds in which the funds of the estate have been invested, and gives a receipt for the same as bonds, specifying the number and the amount of each, and the aggregate amount of the whole, the effect of the transaction is simply to discharge the executor from liability for the funds of the estate which were invested in such bonds. The bonds stand in place of what went into them by investment.

Dillard *et al. vs.* Ellington.

9. If the bonds were turned over and receipted for as part of the estate coming to the legatee, but were, in fact, not a part of the estate, being, on the contrary, securities in which the executor had invested his own money, and if it does not appear that this fact was made known to the legatee, and that a different price was expressly agreed upon, the executor cannot, in the final settlement of his accounts, take credit for more than the actual value of the bonds at the time the legatee received them, with interest thereon.

10. If, during the late war, the executor rightfully applied his own money in paying expenses, he is entitled to credit only for the value of such money, with interest thereon.

11. To apportion any account between two debtors, if each is not to be charged with precisely half, one must be charged with as much more, as the other is with less, than half. No other apportionment is possible. Hence, half of the whole, plus half of the difference, will equal the larger debit; and half of the whole, minus half of the difference, will equal the smaller.

12. In refunding over-payments received from an executor, the legatee called to account, responds *to him* for such part as she received, and is not liable to a co-legatee who received less than she did. And this rule holds when the call to refund is after the death of both legatees, and is made only upon the estate of that one who received the major part. The executor cannot be resisted as to any of that part by showing that the estate of the other legatee has been settled up under a bill in chancery, to which the executor was a party; that no claim was made or allowed, in that settlement, for any difference between the two legatees, in the matter of over-payments; and that the heirs of both legatees are the same persons.

13. If the legatee die before the executor's claim for over-payments is barred by the statute of limitations, the statute will not run against him while he is administrator upon the legatee's estate.

14. That the administrator inventoried and returned certain property as part of the estate of his intestate, will not affect his right to assert that it was left in his hands in her life-time, with an agreement that it sould be security for any sum that might be found due him on final settlement.

15. There being, in a will, a mixed bequest and devise of specific personalty and specific realty, to the executor, in trust for the sole and separate use of the testator's two daughters (his only children) during their lives, and at their death, to their children, respectively; the property to be subject to the debts of no person, and to be held and managed by the executor until the elder daughter became of age, or married, and then to be equally divided; and if either daughter died without child or children, such property to revert to, and belong to, the other sister; and at the conclusion of the will, there being a residuary clause, giving directly to the same two daughters, in equal shares when distributed, all the residue of the testator's estate, of every sort and kind, not disposed of elsewhere in the instrument, the effect of these two clauses of the will, taken together, was to pass out of

Dillard *et al. vs.* Ellington.

the testator, at his death, the whole fee in the subject matter of the specific devise, as well as in the subject matter of the specific bequest; and there was left no reversionary interest to descend to his heirs-at-law.

16. Neither of the daughters having married or had children, on the death of the younger after the elder became of age, the deceased transmitted to her heirs no estate in any of the property embraced in the specific devise and bequest; as to that property, the survivor, from thenceforth, stood as if she had been alone, originally, in both clauses of the will. And, upon her death, afterwards, intestate and without children, the whole of said specific property passed to her heirs and legal representatives.

17. A devise which was obviously and necessarily contingent when the will was made, (such as a remainder in behalf of future children) is not, upon failure of the contingency, within the ordinary rule applicable to a void or a lapsed devise; and the residuary devisee will take, instead of the heir-at-law : 3 Maul. & S., 300; 1 B. & Adol., 186; 6 Paige Ch., 600.

Equity. Amendment. Discovery. Administrators and executors. Judgments. Practice in the Superior Court. Charge of Court. Master. Statute of limitations. Wills. Legacies. Remainders. Before Judge POTTLE. Wilkes Superior Court, May Term, 1876.

The bill of complainants was filed on March 25th, 1873. The case, as made by the pleadings and evidence, is substantially set forth in the opinion.

At the May term, 1875, an order was taken referring the matters of account to the master in chancery, directing that " he report fully upon the state of defendant's accounts, as executor of William B. Ellington, as agent of Violet B., and also as her administrator." At the following November term, this officer made a lengthy report, the final result reached being as follows :

" He finds and reports that on the 1st of April, 1865, there was
due the defendant, S. C. Ellington, from the estate of W.
B. Ellington, the sum of . . . . . . . . . . . . . . . . $17,280 85
Interest on same to January 1, 1875 . . . . . . . . . . . 11,794 19

$29,075 04

He finds and reports that, in transactions since April 1st, 1865,
the defendant is indebted to said estate of W. B. Ellington,
the sum of . . . . . . . . . . . . . . . . . . . . . . . 5,841 93
Interest on same . . . . . . . . . . . . . . . . . . . . 2,307 38

$ 8,149 31

Dillard *et al. vs.* Ellington.

These sums, deducted from the sum of $29,075 04, leaves the
sum still du⬤⬤ defendant, to-wit: . . . . . . . . . . . $20,926 73
He further finds and reports that V. B. Ellington received in
excess of her sister Ann E., from the estate of W. B. El-
lington, the sum of . . . . . . . . . . . . . . . . .    5,768 77
Interest on same . . . . . . . . . . . . . . . . . . .    4,030 13
                                                        ─────────
                                                        $ 9,788 90*

These several sums added together make the sum of . . . . $30,715 63
Deduct the amount due the estate of V. B. Ellington as ad-
.ministrator . . . . . . . . . . . . . . . . . . . . .    3,155 70
                                                        ─────────
Balance due defendant upon settlement of the respective es-
tates, etc . . . . . . . . . . . . . . . . . . . . . . $27,559 93."

Ann E. Ellington, referred to in this report, was a younger
sister of Violet B., and the only other legatee under the will
of W. B. Ellington. She died before Violet B. This will,
so far as material, will be found hereinafter set forth.

To this report the complainants made the following excep-
tions for alleged errors of law :

1st. As appears from the evidence, the defendant, January
1st, 1862, owed the estate of the said W. B. Ellington, as
executor, at least $18,000 00 in gold coin, or its equivalent,
and June 1st, 1865, the apparent balance in his favor, as such
executor, is about $20,000 00, the same having been caused
by the investment by said defendant, in Confederate bonds, in
1863, with which investment the said defendant is improperly
credited in said report at its par value in gold.

The complainants say that the said report should be cor-
rected by debiting the said defendant with the amount so in-
vested, to-wit: $21,287 00, and that said apparent balance
will then disappear. The said defendant really charges him-
self with the purchase money of said bonds by returning the
same as the funds of the estate of said W. B. Ellington, in-
vested under the proper authority in said bonds. That when
said report is corrected, as suggested in this exception, it will
appear that said defendant is still due the complainants a large
balance, to-wit: all of his returned receipts as such executor

---

*Error in addition, or in amounts to be added.

after June 1st, 1865, deducting the proper expenses of administration and other credits.

2d. The balance stated in said report to be due the said defendant (to use its language) " upon settlement of the respective estates," is not due at all, as is shown in the above exception, but, if any part of the same is due, it is wholly Confederate money, erroneously treated by said report to be an amount due in gold, and the same should have been scaled according to the tables of the value of Confederate money which were in evidence.

3d. If there is due the said defendant any such balance as that mentioned in the second exception, the whole of the same is erroneously charged in said report to the estate of the said Violet B. Ellington, when one-half of it should be charged to the estate of Ann E. Ellington.

4th. The complainants say that the item $9,788 90 with which said report credits the said defendant, the same being the principal and interest of an alleged over-payment by said executor to said Violet B. Ellington, should be stricken from the account, it appearing that the estate of Ann E. Ellington, the sole other legatee of William B. Ellington interested, can make no claim against the said defendant for such alleged over-payment, she having in her lifetime released the said executor from any liability for the same by her final receipt, appearing in his returns, which were in evidence before the master. Complainants further say, that if such over-payment can be legally inquired into, the estate of the said Violet B. Ellington would be liable for only one-half of the same, and liable to the heirs of the said Ann E. Ellington, deceased, and not to the defendant, which heirs are the same as these complainants.

6th. Because the master would not admit in evidence, the complainants offering the same, the proceedings of the superior court of Greene county touching the estate of Ann E. Ellington.

7th. During the administration of W. B. Ellington's estate, his executor, Simeon C., purchased seventy-five Georgia state

bonds of various denominations—as fully appears from the returns which were in evidence before the master, the returns also showing that he received credit for all sums expended in their purchase. His returns further show that of these seventy-five bonds he collected, as they became due, ten bonds; that he delivered to V. B. Ellington twenty-four bonds; that he delivered to Ann E. Ellington thirty-five bonds, leaving unaccounted for six bonds, of the value of $250 00 each, with which the said report fails to charge him.

Upon argument of these exceptions, the report was, by consent, corrected so as to charge Violet B. Ellington's estate with only one-half of the balance found due to the executor by the master, on April 1st, 1865, to-wit: one-half of $17,280 85. The above exceptions were then overruled.

The case was submitted to the jury upon the following exceptions, arising upon matters of fact:

1st. The said defendant was discharged from being said executor, 2d March, 1869, when the estate of said W. B. Ellington owed him nothing, and if it did owe him anything, such discharge operated as a complete release of any claims that he may have held at the time against said estate, and such discharge was obtained by the said defendant, as executor, after a final settlement between him and the said legatees, and such settlement cannot now be reopened.

2d. As appears from said report, the defendant, January 1, 1862, owed the estate of William B. Ellington, as executor, $18,656.00 in gold coin, or its equivalent, [using, for the rest of this exception, the exact words of the first legal exception *ante.*]

3d. [A repetition of the second legal exception.]

4th. [A repetition of the third legal exception.]

5th. Complainants say that, according to defendant's returns as executor, he had only the means to make his returned disbursements in Confederate money, during the period the same was in circulation, in payment of current expenses, advances to legatees, and not including investments in bonds, such means consisting of the balance of $18,656 00 heretofore

mentioned, and his entire receipts, as such executor, during the war, as returned, and that under such circumstances any loan of his own money to the estate of his testator to be invested in Confederate bonds, was unauthorized; and the accounts of said executor show one of two facts to be true, that he has failed to charge himself with the purchase money of said bonds, or that he loaned his own money to the estate of his testator to purchase the same.

And the complainants further say, that the said Violet B. Ellington received Confederate bonds to the nominal value of $10,000 00 from the defendant as a part of her legacy aforesaid, June 2, 1864, said bonds being a part of those purchased by the defendant in 1863, as appears from his returns, and the same having been received as above stated, cannot be charged to her at all, and if they are to be charged to her they must be charged at their value when she received them, to-wit: $555 00.

6th. The complainants say that the item $9,788 90, with which said report credits said defendant, the same being the principal and interest of an alleged over-payment by said executor to said Violet B. Ellington, should be stricken from the account, it appearing that the same has already been credited to the executor in allowing his disbursements during the late war, and it appearing further that the estate of Ann E. Ellington, deceased, the sole other legatee of said W. B. Ellington interested, can make no claim against the said defendant for such alleged over-payment, she having in her lifetime released the said executor from any liability for the same by her final receipt set forth in his returns.

Complainants further say that if such over-payment can be legally inquired into, the estate of the said Violet B. Ellington would be liable for only one-half of the same, and liable to the representatives of the said Ann E. Ellington, deceased, and not to the defendant.

Complainants further say that all of such over-payment, if made at all, was made in Confederate money, which should be scaled to its proper value.

8th. Complainants say that a calculation made accurately

and legally ^d differently from that of the master in his said report, in the particulars mentioned in all of these exceptions, shows that there is no balance at all due from the estate of the said W. B. Ellington to his said executor, but that there is a balance in favor of said estate to the amount of $7,000 00, principal and interest.

9th. Complainants say, that if there is any balance due the said Simeon C., as executor as aforesaid, the same is a debt against the estate of his said testator, and can in nowise be collected out of the estate of his said intestate. And complainants further say, if any such claim ever existed, the same is barred under the statute of limitations as against both of said estates. And complainants further say, that the said Simeon C., by turning over to the said Violet B. all of the property passed under his testator's will, such property being the same as that which he now holds as her administrator, assented to the legacies of her father to her, and thereby divested himself of all right and title to the same as executor as aforesaid.

10th. Complainants say that the said Simeon B., by taking possession of the property of his intestate, as her administrator, is estopped from setting up any adverse claim of his own to said property, or any portion of it.

11th. Repeats the seventh legal exception.

Amongst other evidence, not material here, two receipts were introduced in precisely the same words and of the same date, (February 6th, 1868,) except one was signed by Ann E. and the other by Violet B. Ellington. The following is a copy :

" Received of S. C. Ellington, executor of W. B. Ellington, deceased, $25 00, in full of all the balance that is coming to me from the estate of my deceased father, W. B. Ellington, and sixteen and one-half shares of the capital stock of the Georgia Railroad and Banking Company.

" Witness my hand and seal, this February 6th, 1868.

"     V. B. ELLINGTON, [L. S.]
"     M. MARC,          [L. S.]
"     M. L. TOWNS,      [L. S.]"

On the 2d of June, 1864, Violet B. gave her receipt for twenty-four Georgia six per cent. bonds, described in the receipt as being of the following denominations : Five bonds of $1,000 00 each ; seven bonds of $500 00 each ; twelve bonds of $250 00 each ; the receipt concluding, as follows : " Received the within twenty-four state of Georgia six per cent. bonds, described by number and date, amounting to $11,500, as part of what is coming to me from the estate of my deceased father.    2d of June, 1864.

"V. B. ELLINGTON."

At the same time, also, the following :

"Received of S. C. Ellington, executor of William B. Ellington, deceased, nine bonds of the Confederate States of America, all dated 2d March, 1863 (here follows further description of the bonds), and two others, of same date, (here the two bonds further described) all amounting to $10,000 00, as part of what is coming to me from the estate of my deceased father, William B. Ellington.    This 2d June, 1864.

V. B. ELLINGTON."

Ann E. Ellington's receipt appears in the returns, as follows :

"Received of S. C. Ellington, executor of W. B. Ellington, deceased, eleven state of Georgia six per cent. bonds of $250 00 each, (here are given the date and maturity) and nineteen state of Georgia six per cent. bonds of $250 00 each, and the half of another, (date and time of maturity) and one state of Georgia six per cent. bond for $500 00, (date, etc.) and one for $1,000 00, (date, etc.,) and two for $500 00 each, (date, etc.,) amounting in the aggregate to $11,625 00 ; and six Confederate States bonds, $1,000 00 each, dated 29th August, 1862, and due 1st July, 1874; and one Confederate States bond of $1,000 00, dated 6th July, 1863, and due 1st January, 1871, and two of $1,000 00 each, dated 2d March, 1863, and one of $500 00, dated 6th January, 1663, and due 1st July, 1876, amounting in the aggregate to $10,000 00, as part of what is coming to me from the estate of W. B. Ellington,

deceased, late of Greene county, and State of Georgia. This 14th August, 1866.                      ANN E. ELLINGTON."

The returns show the following state bonds matured and collected at the dates as set forth:

January 2, 1862—To cash, seven state of Georgia bonds of $500
 each, this day due . . . . . . . . . . . $ 3,500 00
May 2, 1863—To collecting one $500 00 seven per cent. bond
 state of Georgia, due February 1, 1863, and
 interest . . . . . . . . . . . . . . . . .    535 00
November 5, 1863—To collecting two state of Georgia six per
 cent. bonds, $500 00 each . . . . . . . .  1,000 00

The returns show the following disbursements for Confederate bonds :

April 21, 1863—Funded treasury notes . . . . . . . . . . . $ 2,500 90
April 25, 1863—Purchased of D. H. Ellington . . . . . . . .   1,538 32
Aug. 22, 1863     "     " F. T. Willis. . . . . . . . . .    6,309 69
Nov. 6, 1863      "     " Charles F. McCay, . . . . . . .  10,431 49
Oct. 31, 1863     "     " J. T. Dawson . . . . . . . . .      510 00
                                                          _____
                                                          $21,289 50

INSOLVENT CLAIMS.

"Received of S. C. Ellington, executor of W. B. Ellington, deceased, all the insolvent notes, papers and claims specified in the inventory and appraisement of said estate of William B. Ellington, deceased, and we do hereby discharge the said S. C. Ellington, executor, as aforesaid, from all liability relating to said insolvent papers and claims, and receive the same as a part of our legacy under the will of our deceased father.

"Witness our hands and seals, this 14th November, 1867.
                              "V. B. ELLINGTON, [L. S.]
                              "A. E. ELLINGTON, [L. S.]"

The will of W. B. Ellington, dated March 25th, 1848, was, so far as material, as follows :

Item 1st. Bequeaths his soul to God and his body to the dust.

Item 2d. Directs that his debts be paid.

Item 3d. Bequeaths specific legacy in trust to his wife.

Item 4th. "I deem it prudent to secure a part of the property which I am about to give my daughters in such manner as to meet the changes and incidents which may occur in their lives, in addition to any protection the laws of the land may extend to them. I therefore bequeath and devise unto my executor, Simeon C. Ellington, in trust to and for the sole and separate use of my two daughters, Violet Belle Ellington and Ann E. Ellington, for and during their natural lives, and at their death to their children, respectively, to be subject to the debts of no person whatever, the tract of land whereon I now reside, containing eleven hundred acres, more or less, * * * , to be held and managed by my executor for their special benefit until my oldest daughter arrives at the age of twenty-one years, or marries, after which event I desire all of this property divided between my two daughters above named, in equal shares. Should either of my said daughters, Violet B. or Ann E., die without child or children, such property shall revert to and belong to the other sister."

Item 5th—8th. Specific and money legacies.

Item 9th. "All the residue of my estate, of every sort and kind, not disposed of above, I give to my two daughters above named, in equal shares when distributed."

Item 10th. Appoints Simeon C. Ellington executor.

It was also shown that William B. Ellington died in May, 1848, and that defendant immediately qualified as his executor; that he was finally dismissed by the court of ordinary of Greene county, on March 2d, 1869.

The jury found against all the exceptions.

The complainants moved for a new trial upon the following grounds, to-wit:

1st. Because the court overruled the exceptions based on errors of law in the master's report.

2d. Because the court charged the jury as follows: "You may look to the facts in evidence before you, of the receipt of Belle Ellington for the sum of $10,000 00 to the executor.

Is this payment to her in Confederat' bonds to be estimated according to the face value of these bonds, or is it to be estimated according to the then value of these bonds.

"This question belongs to you exclusively. What was the intention of the parties to the transaction? Did Belle Ellington, in June, 1864, intend to receive these bonds for the amount of them in good money; or did she intend to receive them as Confederate securities at their value in Confederate currency? Did she accept these bonds in payment for the amounts specified in the receipt in money? If she received the bonds without objection as to their market value, you may presume, if the facts and circumstances warrant, that she took them for good money. Look to the receipt itself, the conduct of Miss Ellington, and all other evidence before you to ascertain the intention. You may look, also, to the last receipt of Miss Ellington, for $25 00, which purports on its face to be a receipt in full of all demands against the executor. Does that receipt, considering the time that elapsed between that and the other, throw any light upon the matter of intention? This last receipt, though it purports to be a receipt in full, is subject to be explained by proof and to be reopened if the proof satisfies you that it ought to done."

3d. Because the court charged as follows: "Another exception to the report is that it improperly allows to the executor $5,758 77, with interest, for over-payment to Belle Ellington, in excess of her share, on a division with Ann's share of the estate. Was this a proper allowance by the master? If this amount was over-paid to her, then he is entitled to be allowed that amount."

4th. Because the court charged as follows: "You will see by the original bill that certain questions are put to Simeon C. Ellington, as to his actings and doings as executor of William B. Ellington. After the original bill was filed, defendant answered, under oath, to that bill and to these questions. After that answer was made and filed, complainants amended their bill by disclaiming any discovery from Ellington as executor, inasmuch as a settlement had been made by the execu-

tor of his accounts in Greene county, and he had been discharged as executor. Defendant's counsel insist that notwithstanding this, they can, in law, insist on bringing into this issue the accounts of said executor for the purpose of showing that Belle Ellington, one of the legatees, owed him certain balances against the claim of her heirs against him as administrator.

"These issues between counsel make issues of law for the decision of the court, and the directions which the court will give you, you will receive as law. I charge you, as matter of law, that when complainants called upon defendant, in their original bill, for a discovery in his answer, what the defendant answers in response to that call for discovery is evidence for him; those parts of defendant's answer, in response to the bill, are evidence for defendant and must be disproved by two witnesses or one witness and corroborating circumstances. So that you must consider such portion of these answers as are thus responsive, the truth of the matter in issue until so overcome by two witnesses, or one witness and corroborating circumstances. You may sift these answers and see how they reply to complainants' allegations; the consistency or inconsistency of these answers are matters for you to look into and pass upon."

5th. Because the court charged : " I further charge you that the discharge of Ellington, as executor, by the ordinary of Greene county, is no bar to defendant's setting up this claim for over-paid balances here, nor is he concluded by the settlement made in Greene county by King & Lewis."

6th. Because the court charged as follows : " At the time the investments were made in Confederate bonds, the law allowed the investments to be made even if good money was used for that purpose. It is for you to say what kind of money was used in the purchase of these bonds, and if in Confederate money, whether Miss Ellington accepted them as good money."

7th. Because the court charged as follows : " Take these exceptions, one by one, from first to last; if you find the ex-

ceptions, or either of them good, say so as to each one; if you find the exceptions not good, say so as to each one. Say sustained or not sustained, as to each item of the exceptions. The following I suggest to you as a guide in your verdict; if you find the first exception good, say we sustain the first exception; or, if you find the exception not good, say we find against the first exception, and so on to the last."

8th. Because the court charged as follows: " Defendant's answer touching the amount and disposition of stocks and bonds received by, and the property of V. B. Ellington, being responsive to the interrogatories set out and propounded in complainants' bill, must be taken as true, unless disproved by two witnesses, or one witness and corroborating circumstances."

9th. Because the court failed to instruct the jury explicitly upon each exception as demanded by its allegations and called for and warranted by the evidence.

10th. Because complainants' counsel, having read the master's report, with their exceptions, as pleading, the court ruled that said report was in evidence.

11th. Because the verdict was contrary to law, to the evidence, without evidence to support it, and strongly and decidedly against the weight of the evidence.

The motion was overruled and complainants excepted.

The court thereupon decreed, in substance, as follows: That defendant, as the administrator of V. B. Ellington, proceed, upon giving legal notice, to sell all the Georgia Railroad stock held by him as administrator as aforesaid, and from the proceeds of said sale and the dividends thereon received since the master's report, pay as follows:

1st. The expenses of administration which have accrued since said account was taken and approved by the court and jury at the last term.

2d. To retain for his own use a sufficiency, if enough, to satisfy the amount found due him by said report.

3d. To pay any balance which may be remaining to the heirs-at-law of Violet B. Ellington.

It decreed further that the tract of land devised to Violet B. and Ann E. Ellington for life, and their children, if any, upon the death of the said Violet B. and Ann E., without children, did not descend to the heirs of Violet B., but to the heirs of William B. Ellington living at the death of said Violet B.

To this decree the complainants also excepted.

Error was assigned accordingly.

JOHN C. REED; W. G. JOHNSON; LUMPKIN & OLIVE; S. H. HARDEMAN, for plaintiffs in error.

R. TOOMBS, for defendant.

BLECKLEY, Judge.

Most of the heirs and distributees of Violet B. Ellington, deceased, filed their bill against Simeon B. Ellington, her administrator, for discovery and account; the object being to compel the administrator to distribute the estate, and pay to the complainants their respective shares, each share being one thirty-seventh part of the whole. As originally framed, the bill called for full discovery touching assets, expenditures, investments, and all transactions of the defendant, not only as administrator of the intestate, but as executor of the will of her father, W. B. Ellington, and as trustee under that will, and as agent of the intestate prior to her death. This wide range was taken, on the theory that the estate of the intestate consisted of more than the property set forth in the administrator's inventory, and that the excess was in the form of money, or other assets, for which he was accountable as executor of her father, and as her trustee and agent. The defendant answered, making the discovery prayed for; but instead of disclosing a balance against him, the answer claimed a balance in his favor, growing out of alleged over-payments by him as executor of the father's estate, and prayed a decree therefor. The complainants then amended their bill, striking out all allegations touching the defendant's transactions as

executor, and renouncing any claim upon him in that charac-
ter, averring that he had been discharged by the ordinary
from his office of executor, after a final settlement of his ac-
counts, and protesting against reopening the settlement or
going behind the discharge. The court, nevertheless, referred
the case to a master, to report on the defendant's several ac-
counts, as executor, as agent, and as administrator. The
master reported; and divers exceptions to his report were
filed by the complainants, the same matters being presented,
first as exceptions of law, and again, most of them, with some
others, as exceptions of fact. The court overruled them
(after some alteration was made, by consent, in the report) as
exceptions of law; and as exceptions of fact, sent them to a
jury for trial. A verdict sustaining the report by a general
finding against all of the exceptions, was rendered. There-
upon the court made a final decree in conformity with the
report, which allowed a large balance as due to the defendant
for over-payments made to the intestate in her lifetime, by
the defendant as executor of her father's estate. Going
further, the decree, in defining the assets to be administered,
construed the father's will in a way to exclude from the
assets of the daughter's estate certain realty alleged by the
bill to be a part of the property to be accounted for; the
same being also set forth in the inventory returned by the
defendant as administrator of her estate. The complainants
made a motion for a new trial, grounded on overruling the
exceptions as matters of law; on misdirection to the jury;
on conflict of the verdict with law and evidence; and on
error in the decree as to the realty in question. This motion
was overruled.

1. On a bill by the heirs and distributees of an estate
against the administrator, for account and settlement, the
ultimate question is, what are the assets remaining after all
liabilities are deducted? To determine that question, it is
necessary to ascertain what should be counted as assets, and
what as liabilities. If, for this purpose, the condition and
accounts of some other estate ought to be examined, the ex-

amination may be called for as a part of the general case. The complainants framed their bill on this theory, demanded full discovery, and obtained it. The result being apparently favorable to the defendant, they sought to cut off one branch of the case by an amendment to the bill, and thus deprive their adversary of the benefit of all the discovery which he had made in respect to that branch. This was to make the defendant their witness, and then turn their backs on his testimony. With, as without the amendment, the defendant was entitled to use his answer as evidence, so far as it was responsive, and to take the benefit of it so far as the responsive matter was a defense, in whole or in part, to the bill as left standing. ᠁The principle is, that after obtaining discovery, the effect of it is not to be avoided by merely striking out a part of the bill and retaining the balance. After discovery is obtained it is too late to waive it: 50 *Georgia Reports,* 53. See, also, Code, section 4190.

2. Besides contending that the amendment turned the subject matter of over-payments out of the case, the complainants urged that the defendant's discharge as executor closed his accounts, as such, and that he could not re-open them for the purpose of claiming credit for any balance that the returns might show in his favor. If this position as to the effect of the discharge, had been taken in resistance to an effort originating with the defendant to bring in the accounts, there might be force in it. There seems to have been an incomplete settlement between the executor and the legatee, treated by both as partial and provisional only. Afterwards, without any further reckoning or payment, the legatee seems to have given a receipt in full, which receipt was used by the executor in obtaining his letters of dismission. Under these circumstances, it might not be unreasonable to hold, that the effect was, to close the accounts on both sides, and that neither the executor nor those claiming through the legatee could re-open them, except for fraud or mistake, unmixed with negligence. The judgment dismissing the executor might operate equally for and against him in putting to rest all question of no

unbalanced accounts being left between him as executor and the legatee, and might be conclusive that all funds which he administered or paid over as a part of his testator's estate were so in fact. The payments now claimed to have been over-payments, could be presumed to have had some influence on the ordinary in granting the discharge. They were a part of the evidence on which it was granted, for they were set out in the executor's returns. If the executor could withdraw from the operation of the judgment a part of its foundation, and still leave it standing in his favor, where would be the limit to this process of *pulling out?* If some of the payments could be recovered back as unaffected by the judgment, why not all of them, so far as any impediment offered by the judgment is concerned? Moreover, the executor had the benefit, before the ordinary, of the legatee's final receipt in full. Would that receipt have been given except as a sequel to *all* the prior payments? With the payments standing as they were made, the legatee would probably be less careful to see, before receipting in full, that the executor had charged himself with all the assets which came to his hands; and, especially, would the amount of the payments, with no notice that any part was to be reclaimed, operate to prevent any cause from being shown against the application for discharge, though good cause, if the payments had been less, might exist. After the executor's discharge, why should over-payments be any more in his reach than deficient payments would be in the reach of the legatee? Were the legatee to sue for payments that *ought* to have been made, but were not made, the judgment of discharge would be a bar in favor of the executor. Why, then, when the executor reclaims payments that *ought not* to have been made, but were made, should not the judgment of discharge be a bar against him? The reply, if any there be, would have to rest on the theory that what is adjudicated when a discharge is granted, is simply that all the estate has been administered, and that those entitled to it have received it. Where this appears, the executor or administrator is en-

titled to have letters of dismission (it may be said) whether over-payments have been made or not. Thus, nothing is adjudicated as to over-payments—they are entirely irrelevant and immaterial, since, with or without them, the judgment would be the same. The judgment speaks affirmatively that enough has been paid, but is silent as to more than enough. Such a reply has the look of strength about it. We need not now hold it sufficient, however, for both parties went behind the judgment voluntarily, and thereby waived the bar of it, once for all, in this litigation. After the complainants have helped to bring the truth into court, how can they say that it has no business there, and that the defendant is estopped from having it there and using it? The judgment was matter of record, and the complainants might and should have known of it, and if they meant to insist on it, should not have run over it in the beginning.

3. The charge of the court on the subject of overcoming or discrediting the defendant's answer as evidence, was correct as far as it went. It gave the general rule, and in addition thereto, stated that the consistency or inconsistency of the answer was to be regarded and passed upon. The effect of conflict with documentary evidence should have been suggested by counsel and some request made to charge thereon, if counsel contended that such conflict existed.

4. The master's report proves the facts and conclusions of fact stated therein, until shown to be untrue or erroneous in respect to the matters controverted by the exceptions. The property of being evidence to this extent is inherent in the report. The report cannot go to the jury for any purpose without bearing that property along with it.

5. It is doubtful whether, if an exception be true in part and false in part, it can be sustained at all. But the court is certainly justifiable in dealing with each exception as a unit, unless requested by counsel to consider them as divided into parts. No request was made of the court to instruct the jury that they might, if they thought the evidence warranted it, find such or such a part of an exception sustained, and the

balance not sustained. That the court failed, not refused, so to instruct, is the point of the complainants' objection to the charge touching the form of the verdict. We do not think the point well taken.

6, 7, 8, 9. In respect to the Confederate bonds turned over by the executor to the legatee, we think the court's charge was erroneous. The authority of the executor to invest in such securities need not be considered; for the legatee, when of full age, ratified the investment by accepting the bonds as a part of the estate of her father. The latter having died before the war, she must have known that these bonds were not original assets. As she made no complaint of the investment, her heirs cannot be heard to complain of it now. The bonds represented what went into them—nothing more, and nothing less. The effect of turning them over was, therefore, to discharge the executor from otherwise accounting for the original assets, their proceeds and accumulations, so invested. It was not to make the legatee his debtor, but to perform his obligation, as trustee, to surrender a trust fund. The bonds had never been his property, beneficially, and he was not making a sale of them, but a delivery to the true owner. If this was not the truth of the case, and the bonds really represented the executor's money, and not money of the estate, then indeed were they the property of the executor. But there is no trace in the evidence of his having so informed her; or of any contract between them for a sale of the bonds. It is scarcely credible that she could have understood that she was purchasing such bonds from him; and it is utterly incredible that she intended to purchase, or he to sell them, at par in good money. The receipts which were given for them tend to negative any suggestion that there was a sale at all. But suppose they were his, and he sold them to her, what ought her estate to pay for them? Certainly not more than their real value, with interest, unless a different price was expressly named and assented to; the burden of proving which would rest on him. Whenever she, after arriving at age, received a dollar of the estate, whether in its first form, or any succeed-

Dillard *et al. vs.* Ellington.

ing form into which it had been changed, the executor was discharged to the extent of one full dollar; but when she received, if at all, a dollar belonging to the executor, the value of the so-called dollar became the measure of his credit, or of her debit, unless a different measure was agreed upon. In other words, a dollar of the estate on both sides of the executor's account ought to balance, however depreciated it might have been when the legatee received it; but a depreciated dollar of his own, without some express agreement in regard to it, should not cancel his debit for an undepreciated dollar belonging to the estate. It should cancel of the latter a part equivalent to its own real value, and no more. Or, if it was a sheer over-payment to the legatee, in excess of any assets charged, or chargeable to the executor, then, in reclaiming it, he should recover its real value at the time the legatee received it, with interest. That would be exact equity to both parties. The court's charge on the subject, should have been in substantial conformity to these views. On the state of facts in evidence, it was error to submit the question of whether the bonds were received as good money. They were received, not as money, good or bad, but as bonds; and it made no difference what sort of money went into them; though it did make a most important difference whether that money really belonged to the estate or to the executor. If, in instructing the jury to look to the final receipt in full, given by the legatee to the executor, the court meant to suggest that it was, or might be possible to draw from that receipt any support, whatever, in aid of the hypothesis that the bonds were received as money, and at their nominal amount in good money, the court erred in this part of the charge, also. We think, too, that as the pleadings stood, it was not appropriate to instruct the jury that the receipt was subject to be reopened. The complainants having amended their bill, renouncing all claim upon the defendant in his character of executor, there was, or ought to have been, no dispute that the receipt in full was, as far as it went, a correct and proper receipt. We do not understand that either party sought at

the trial to reopen it. The defendant contended that, as executor, he had paid the legatee in full and over-paid her. The complainants admitted that he had paid her in full (and to that extent went the receipt) but denied that there had been any over-payment. Both of these positions were consistent with the receipt. The receipt said there had been full payment. The complainants said so too; and the defendant said there had been that and more. On the question of more, the parties were at issue. If, by reopening the receipt, the court meant simply, that the defendant was not, by accepting the receipt, concluded from proving his over-payments and having a proper allowance for them in this case, the idea in the judge's mind was quite correct. But if this was the meaning, it should have been more distinctly expressed. In construing the receipt and ruling upon its character and effect, we notice, of course, that it is a document relating only to business affairs between the parties to it, as legatee and executor. It does not purport to deal with their relations as principal and agent. What had been previously receipted for by the legatee and left in the defendant's hands as her agent, would be as subject to be called for by her or her legal representatives after this receipt was given as before. Her receipt in full to the executor, as such, signifies that all of her father's estate to which she was entitled had been turned over to her, and that she had no further claim upon him connected with the trust imposed by her father's will. What claim, if any, she may have had upon him as an individual, or as her agent or bailee, the receipt does not pretend to speak. In regard to that part of their business, it is utterly silent.

10. That the executor ever advanced any of his own money for the benefit of his testator's estate, is not declared expressly on the face of his annual returns. It is but an inference from the state of his accounts, comparing the amounts received with the amounts paid out. His answer to the bill, does not specify the various sums advanced, or give the precise dates at which advances were made. From some of the results arrived at by the master in his report, there is strong proba-

Dillard *et al. vs.* Ellington.

bility that some part of the large balance appearing in the executor's favor, on aggregating his returns, grew out of contributions from his own funds, made during the late war, and either invested in Confederate securities, or applied in payment of current expenses, such as taxes, support and maintenance of the two daughters of the testator, etc. As to any money of the executor which may have been invested in Confederate securities, we have already seen that the securities would not be the property of the estate, although so treated by the executor, and that the credit therefor to which he would be justly entitled would be no more than their actual value at the time of turning them over. The same principle would apply to any advances rightfully made by him in paying expenses. If they are credited to him, as of the proper dates, at their then real value (adding interest if they were in excess of all his proper debits), he will have the full measure of his rights. If he advanced depreciated currency, it was paid out as depreciated currency, and expenses thus defrayed must have been nominally more than they would have been if a better currency had been used. Therefore, the benefit to the estate, or to the testator's daughters (the legatees), must have been less from each and every dollar, than it would have been if the money had been good money. If, contrary to the probabilities of the matter, whether we rest upon the public history of the times or the just inferences from the evidence in the record, he advanced and used *good money* to pay expenses in 1863, 1864, and the early part of 1865, he should not only prove the fact, but should, moreover, reconcile it with the large aggregate of expenses in each of those years, and with the inflated prices which his vouchers exhibit as to many of the particular items. Money belonging to the estate, and used for its benefit, is not to be scaled; but money put in by the executor is to count only for what it was worth. What has already been said in respect to the difference between bonds of the estate and bonds of the executor, is equally applicable to currency paid out as expenses.

11. Allowing there to be a balance in favor of the execu-

tor on a proper adjustment of his executorship accounts, as a whole, such balance would, of course, not all be chargeable to one of the legatees. Thus charging it by the master in his report, was, at the hearing, conceded to be erroneous, and the report was so far corrected as to debit the estate of Violet B. with one-half, instead of the whole of the balance found. This was recognizing the position taken in the third exception of law. But as Violet B. received, or had the benefit of more, and her sister of less, than half, the report added to Violet B's debit of one-half, the whole difference between them; that is, the whole amount which she received or had the benefit of in excess of what her sister received or had the benefit of. ' This addition was too much, even if the figures used had been otherwise correct. It was just double what it should have been. No sum or quantity can be divided unequally into two parts, one of which shall be equal to half of the whole and the whole of the difference between the parts themselves. If an account be chargeable severally to two persons, in the proportion each was benefited, each should be charged with half of those parts of the account which accrued for joint and equal benefit, the whole of those parts which accrued for sole benefit, and a *pro rata* proportion of such parts as accrued for joint but unequal benefit. If gone through with in detail and each item or group of items dealt with separately, this would be the principle of classification in respect to each and every dollar. But the same general result would be arrived at, if, knowing only the aggregate of the account, and the aggregate of the excess received by one of the persons over the other, we should take half of each of these aggregates and add them together to find the amount chargeable to one of the persons, and subtract half of the latter aggregate from half of the former (that is, half of the excess from half of the account) to find the amount chargeable to the other person. It is only a truism that, for a sum to be composed of any two quantities, both must be equal, that is, each must be precisely half of the sum; or else one must exceed, and the other fall short of half, not by the difference between the

Dillard *et al. vs.* Ellington.

two, but by half of that difference; that is, by the difference between either and the half of both.

12. If each legatee got more than she was entitled to, it would be a singular consequence that one of them should have to refund to the other, and not to the executor. How could a legatee who had been overpaid, herself, complain that another got more than she? We can see no possible relevancy to this case, in anything which has been done or omitted, or which might have been done, in relation to settling up the estate of the younger sister. There is no pretense that her estate, or that the defendant as representative thereof, is chargeable with anything, or that that estate has not been fully and finally administered. The defendant is not now contending that one sister's estate owes the other's estate, but that both estates severally owe him; and he seeks to recover out of one of them what it owes, and no more. That, in settling up the other, he made no similar claim upon it, is his own concern. That he waived his rights in respect to that estate, does not oblige him to do the like in respect to this.

13. Touching the statute of limitations, as a bar to the allowance of the claim for over-payments, we need say only, that we do not think a creditor's claim can become barred while he is the sole administrator upon his debtor's estate. As he cannot sue himself, the statute does not run; and we are not aware of any law that compels the exercise of the right of retainer, on pain of forfeiting it, within any specific time after taking out administration.

14. We do not regard the administrator's inventory as inconsistent with his position, that he was a creditor in possession of the personalty, with a right, by contract, to treat it as security for his debt. Whether the property was thus burdened or not, it is equally the property of the intestate's estate, and the inventory is still true. The administrator does not object to administering the personalty, but what he wants is, to take the proceeds as a creditor. Whether he can do that or not, will depend in no degree on contradicting the inventory. In like manner, the inventory, as to the realty also,

corresponds with the state of the title, as will be seen below, for which reason there need be no consideration of what its effect might have been, by way of estoppel upon the administrator, if the true title had been at variance with it.

15, 16, 17. We think that the testator intended to, and did, die testate as to his whole estate. After completing specific devises and bequests, he adds: "All the residue of my estate of every sort and kind not disposed of above, I give to my two daughters above named, in equal shares when distributed." The clause containing the specific devise and bequest to his daughters (omitting introductory matter) reads thus: "I therefore bequeath and devise to my executor, S. C. Ellington, in trust to and for the sole and separate use of my two daughters, Violet B. and Ann E., for and during their natural lives, and at their death, to their children, respectively, to be subject to the debts of no person whatever, the tract of land (describing it) and (certain personalty, describing it) to be held and managed by my executor until my eldest daughter arrives at age, or marries, after which event, I desire all this property divided between my said daughters in equal shares. Should either of my said daughters die without child or children, such property shall revert to and belong to the other sister." When the younger daughter died, her interest in the whole property embraced in this clause ceased, and the survivor stood as if she had been alone originally. The property *reverted* to her, and, construing both clauses of the will together, she then held the whole, with a contingent remainder to her children interposed between her particular estate for life, and her reversion in fee. Technically, perhaps, the particular estate would be in the trustee for her benefit, and the reversion not in the trustee, but properly in herself. At all events, while she lived, the contingent remainder was not drowned out. Her estate was the equivalent of a fee, subject to be cut down by the remainder. When she died without children, the fee, unimpaired by the contingent remainder, descended to her heirs. It is not certain that aid is needed from the residuary clause of the will, to pass

Dillard *et al. vs.* Ellington.

the reversion into the surviving sister, as to the whole of the specific property. But if needed, we think that clause may be invoked. The failure of a remainder to become vested, which the testator must have known, and not merely may have known, might never vest, is not like the ordinary case of a void or a lapsed devise. When the testator created a remainder in favor of children unborn, he must have known that they might never be born, and hence that the remainder was necessarily contingent. On the state of facts which he knew to exist at the time the will was made, he knew that there was a reversion as to this specific property. But intending to leave none of his estate undisposed of, he proceeded to dispose of this reversion effectually in the residuary clause, if he had not already done so in the previous clause. When a reversion *may* be incident to a specific devise, the testator may be supposed not to have contemplated it; but when it *must* be incident, and cannot possibly be otherwise, the presumption should be that he had it in mind, and that language used by him, sufficiently comprehensive to dispose of it, was used with that intent: See 1 Jarman on Wills, 591, 592, 593; 1 Mau. & Sel., 300; 1 B. & Adol., 186; 6 Paige Ch., 600. On this view of the matter, the distinction is evident between the present case and that in 50 *Georgia Reports,* 523. It is proper to suggest that, as to the specific property in question, whatever interest in the reversion passed temporarily to the younger sister, under the residuary clause, was, on her death, without children, terminated or carried over by virtue of the previous provision that "such property shall revert to and belong to the other sister."

It is full time to close this already too lengthy opinion. We need not apply its principles to all that was done or said by the court, and which has been complained of as error, approving or disapproving everything in detail. The application will, we trust, be sufficiently obvious for all practical purposes. Let the decree be set aside, and a new trial granted.

Judgment reversed.